## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## BLUEFIELD DIVISION

| | | |
|---|---|---|
| **MARCUS BUGGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 1:18-00729** |
| | ) | |
| **KELLY LUCAS, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following: (1) Defendant Meade's Motion to Dismiss (Document No. 33), filed August 30, 2018; (2) Plaintiff's Motion for Injunctive Relief (Document No. 52), filed on November 1, 2018; (3) Defendants Lucas, Carothers, Stark, Dunbar, Connors, Stock, Rickard, LeMaster, Walters, Price, Carver's ("BOP Defendants") "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 54), filed on November 9, 2018; and (4) Plaintiff's Motion for Default Judgment (Document No. 56), filed on November 13, 2018. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants in moving to dismiss. (Document Nos. 35, 57.) Plaintiff filed his Responses in Opposition on September 17, 2018, and February 4, 2019. (Document Nos. 37 and 63.). Having examined the record and considered the applicable law, the undersigned has concluded that Defendant Meade and BOP Defendants' Motions (Document Nos. 33 and 54) should be granted and Plaintiff's Motions (Document Nos. 52 and 56) should be denied.

## PROCEDURAL HISTORY

On April 30, 2018, Plaintiff, acting *pro se*, filed his Application to Proceed Without

Prepayment of Fees and Complaint seeking relief pursuant to the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and for alleged violations of his constitutional and civil rights pursuant to <u>Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971).[1] (Document Nos. 1 and 3.) Plaintiff names the following as Defendants: (1) Kelly Lucas, Medical Supervisor; (2) Chandra Carothers, Physician Assistant ("PA"); (3) Angela Dunbar; (4) Ian Connors; (5) Karl Stocks; (6) Adam Meade,[2] Orthopedic Assistant; (7) Barbara Rickard; (8) AW LeMaster; (9) Nurse Walters; (10) Ashley Starks, Nurse; (11) Nurse Price; (12) AW MS Carver; and (13) Jane Doe, X-ray Technician. (Document No. 3.) Plaintiff alleges that he broke his hand while playing basketball on June 21, 2017, at approximately 7:00 p.m. (<u>Id.</u>, p. 4.) Plaintiff states that he reported to sick call the following morning and informed Defendant Starks that he had broken his hand, he was in "tremendous pain, and he "needed a doctor immediately." (<u>Id.</u>) Plaintiff states that Defendant Starks "failed to act" and only gave him Ibuprofen for pain. (<u>Id.</u>) Plaintiff alleges that after the x-ray confirmed that Plaintiff had a broken hand, Ms. Carothers informed him on June 23, 2017, that he should not take Ibuprofen. (<u>Id.</u>) Plaintiff acknowledges that he was provided a "weekend of Tylenol," but complains he was still denied access to a doctor. (<u>Id.</u>) Plaintiff further complains that Mr. Meade placed a cast on his wrist on June 30, 2017, without any evaluation by a doctor or being provided any pain medication. (<u>Id.</u>) Plaintiff alleges that during this period of time, he continuously

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

[2] In his Motion, Defendant Meade states that Plaintiff incorrectly designates him as "Meade Adams" instead of "Adam Meade." (Document No. 33.) Therefore, the Clerk is **DIRECTED** to substitute Adam Meade as a Defendant and terminated Meade Adams from the Docket Sheet.

complained to Supervisor Lucas that he was not receiving proper medical care. (Id.) Plaintiff states that after the "4th & 8th weeks," Mr. Meade informed Plaintiff that his hand was not healing correctly. (Id.) Although Plaintiff states that he continuously requested medical treatment, Plaintiff states that an MRI was not conducted until September 18, 2017. (Id.) Plaintiff further complains that Ms. Carothers removed his soft cast on October 27, 2017, and directed him to place a wrist brace on his hand. (Id., p. 5.) Plaintiff, however, states that Ms. Carothers incorrectly provided him with a left-hand brace. (Id.) Plaintiff alleges that he informed Ms. Carothers that "it was the wrong hand," but Ms. Carothers failed to respond. (Id.) Plaintiff states that he again notified Supervisor Lucas that he was receiving improper medical treatment and his need for pain medication, but she failed to respond. (Id.) Plaintiff acknowledges that he was evaluated by an orthopedic surgeon on October 30, 2017. (Id.) Plaintiff, however, complains that the orthopedic surgeon could not view the MRI because the disc was "locked." (Id.) Plaintiff alleges that the orthopedic surgeon recommended corrective surgery, a repeat MRI, and that pain medication be provided to Plaintiff. (Id.) Plaintiff states that Defendants failed to follow the orthopedic surgeon's recommendations. (Id.) Plaintiff complains that his corrective surgery was performed on January 10, 2018, without his MRI results being reviewed by the surgeon. (Id.) Plaintiff further complains that he was not provided with any pain medication by medical staff after he returned to the institution following his surgery. (Id., p. 8.) Plaintiff acknowledges that Tylenol 3 was administered by Nurse Walters the following day (January 11, 2018), but he became "sick" because he had not eaten. (Id.) Plaintiff complains that on January 12, 2018, Nurse Walters again administered Plaintiff's pain medication without food knowing that the medication would cause Plaintiff to be "sick." (Id.) Plaintiff states that Nurse Walters again attempted to administer his pain medication without food on January 13,

2018, and Plaintiff refused the medication. (Id.) Plaintiff complains that Nurse Walkers then improperly "changed Doctor Charron's prescription to Tylenol." (Id.) Plaintiff alleges that he informed Ms. Carothers of his continued pain on March 2, 2018, and she informed him to buy his own medication from the commissary. (Id.) Plaintiff contends that he had a follow-up appointment with Dr. Charron on March 6, 2018, and Dr. Charron ordered pain medication for Plaintiff. (Id.) Plaintiff complains that medical staff failed to fill his pain medication prescription until March 16, 2018. (Id.) As relief, Plaintiff requests monetary compensation, transfer to Manchester Kentucky, and appropriate medical treatment. (Id., pp. 5 – 6.)

As Exhibits, Plaintiff attaches the following: (1) A copy of Plaintiff's "Request for Administrative Remedy Informal Resolution Form" dated June 27, 2017 (Id., p. 10.); (2) A copy of Plaintiff's "Request for Administrative Remedy" dated August 29, 2017 (Id., p. 11.); (3) A copy of Plaintiff's "Regional Administrative Remedy Appeal" dated October 12, 2017 (Id., p. 12.); (4) A copy of Plaintiff's "Central Office Administrative Remedy Appeal" dated December 6, 2017 (Id., p. 13.); (5) A copy of Plaintiff's "Request for Administrative Remedy" dated received by Administrative Remedy Coordinator on July 17, 2017 (Id., p. 14.); and (6) A copy of Plaintiff's "Request for Administrative Remedy" dated received by Administrative Remedy Coordinator on August 7, 2017 (Id., p. 15.)

By Order entered on June 18, 2018, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees and directed the Clerk to issue process upon receipt of Plaintiff's initial partial payment of the filing fee. (Document No. 5.) On August 6, 2018, Plaintiff filed an Amended Application to Proceed Without Prepayment of Fees indicating that he was unable to pay the initial partial payment of the filing fee. (Document No. 12.) By Order entered on

August 7, 2018, the undersigned granted Plaintiff's Amended Application to Proceed Without Prepayment of Fees, vacated the Court's prior Order that required Plaintiff to pay an initial partial payment of the filing fee, and directed the Clerk to issue process. (Document No. 14.) The Clerk issued process on the same day. (Document No. 15.)

On August 30, 2018, Defendant Meade filed his Motion to Dismiss and Memorandum in Support. (Document Nos. 33 and 34.) Defendant Meade argues that Plaintiff's Complaint should be dismissed based on the following: (1) "Plaintiff's claim neither pleads, nor meets the legal threshold for a viable Eighth Amendment claim" (Id., pp. 5 – 10.); and (2) "Plaintiff has failed to comply with the Notice of Claim and Screening Certificate of Merit requirements of West Virginia Code § 55-7B-6" (Id., pp. 10 – 14.). As an Exhibit, Defendant Meade files a copy of his Affidavit. (Document No. 33-1.) Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on August 31, 2018, advising him of the right to file a response to Defendant Meade's Motion to Dismiss. (Document No. 35.) Plaintiff filed his Response in Opposition on September 17, 2018, and Defendant Meade filed his Reply on September 21, 2018. (Document Nos. 37 and 38.)

On October 29, 2018, Plaintiff filed his Motion to Amend Facts and Prayer for Relief. (Document No. 48.) Plaintiff submits a copy of his amendment clarifying his allegations against Defendants and amending his prayer for relief. (Id., pp. 2 – 3.) As to Defendants Connors, Dunbar, Rickard, Carver, and LeMasters, Plaintiff states as follows:

> These defendants are responsible for the order and operations of the institution. They make sure policy and procedures are implemented and followed and are the employers of the medical department. They're responsible for order and operations and also the exhaustion of the administrative remedies and appeals.

(Id., p. 2.) As to Defendants Lucas, Carothers, Starks, Price, Walters, Weaver, and Meade, Plaintiff

states as follows:

> These defendants are responsible for the medical department and proper efficient medical care, which I did not received. They actually failed to provide policy and procedures in a timely fashion, which was inadequate, negligent and very delayed and deliberately indifferent to a serious medical need. Lack proper training on medical injuries and emergencies.

(Id.) As to Defendant Stocks, Plaintiff states as follows:

> Mr. Stocks is responsible for inmate dilemmas and assistance with administrative problems and your safety. May hand was fractured in multiple areas and when I turned in BP-9, I informed Mr. Stock I could not sign and dated BP-9 because my writing hand was broke. He informed me he would place an X and handle it which was later rejected for failure to sign, which delayed care and my exhaustion of administrative remedies.

(Id.) As relief, Plaintiff states "I would like to amend my prayer of relief $1,000,000 compensatory damages and $2,000,000 punitive damages in the individual capacity and official capacity. Also, I would like for defendants to pay for *pro se* plaintiff's attorney fees." (Id., p. 3.) By separate Order entered this day, the undersigned as granted Plaintiff's above Motion to Amend. (Document No. 71.)

On November 1, 2018, Plaintiff filed a Motion for Injunctive Relief. (Document No. 52.) Plaintiff requests an injunction preventing his placement in a higher security level. (Id.) Plaintiff states that he is designated as a medium security placement, but "Defendants have used their authority and power to go above and beyond to place me in a higher security placement." (Id.) Plaintiff states that "they switched my custody level for reasons not known to me other than retaliation." (Id.) Therefore, Plaintiff requests that this Court intervene and stop his transfer to a higher security placement. (Id.)

On November 9, 2018, BOP Defendants filed a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document Nos. 54 and 55.) BOP Defendants argue that

6

Plaintiff's <u>Bivens</u> claim should be dismissed because: (1) "Plaintiff cannot establish an Eighth Amendment violation" (Document No. 55, pp. 10 – 15.); (2) "Lack of personal jurisdiction over Defendants Dunbar and Connors" (<u>Id.</u>, pp. 16 – 17.); (3) "Plaintiff makes no specific allegations against Defendants Dunbar, Rickard, Stock, LeMaster, Carver, or Connors" (<u>Id.</u>, p. 17.); (4) "Defendant Lucas is a U.S. Public Health Service employee and is entitled to absolute immunity" (<u>Id.</u>, p. 18.); (5) "The Defendants are entitled to qualified immunity" (<u>Id.</u>, pp. 18 – 19.); and (6) "Respondeat Superior is not applicable" (<u>Id.</u>, pp. 19 – 21.). As to Plaintiff's FTCA claim, BOP Defendants argue as follows: (1) "The United States of America is the only proper defendant in an FTCA action" (<u>Id.</u>, p. 21.); (2) "Plaintiff failed to exhaust by filing an Administrative Claim under FTCA" (<u>Id.</u>, pp. 22 – 23.); and (3) "Plaintiff's negligence claim must be dismissed for failure to comply with the West Virginia Medical Professional Liability Act" (<u>Id.</u>, pp. 23 -15.).

As Exhibits, Defendants attach a copy of the following: (1) The Declaration of Tiffanie Little (Document No. 54-1, pp. 2 – 3.); (2) A copy of Plaintiff's SENTRY Administrative Remedy Generalized Retrieval (<u>Id.</u>, pp. 16 – 24.); (3) A copy of Remedy ID No. 910061 (<u>Id.</u>, pp. 5 – 14.); (4) A copy of Plaintiff's SENTRY Quarters History (<u>Id.</u>, pp. 26 – 29.); (5) The Declaration of Chandra Carothers (<u>Id.</u>, pp. 31 – 35.); (6) A copy of Plaintiff's relevant medical records (<u>Id.</u>, pp. 37 – 225.); (7) The Declaration of Kelly Lucas (<u>Id.</u>, p. 227.); and (8) The Declaration of Ashley Copolo (formerly Ashley Stark) (<u>Id.</u>, pp. 229-30.).

On November 13, 2018, Plaintiff filed his Motion for Default Judgment. (Document No. 56.) Notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on November 14, 2018, advising him of the right to file a response to the BOP Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 57.)

On November 27, 2018, BOP Defendants filed their Response in Opposition to Plaintiff's Motion for Default Judgment. (Document No. 58.) On February 4, 2019, Plaintiff filed his Response in Opposition to BOP Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 63.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992); also see Goode v. Central Va. Legal Aide Society, Inc., 807 F.3d 619 (4th Cir. 2015).

Federal Courts are Courts of limited jurisdiction that are empowered to consider cases authorized by Article III of the United States Constitution and statutes enacted by Congress.

Bender v. Williamsport Area School District, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). A motion to dismiss filed pursuant to Rule 12(b)(1) raises the question of the federal court's subject matter jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Once subject matter jurisdiction is challenged, plaintiff bears the "burden of proving that subject matter jurisdiction exists." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). Subject matter jurisdiction cannot be waived by the Court or the parties. The absence of subject-matter jurisdiction may be raised at any time. Lovern v. Edwards, 190 F.3d 648 (4th Cir. 1999). When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a District Court may refer to evidence outside the pleadings without converting the proceeding to one for summary judgment. See William v. United States, 50 F.3d 299 (4th Cir. 1995). The Fourth Circuit has explained the standard of review as follows:

> [W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged. On the other hand, when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdiction facts. And when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous.

Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009).

**Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts

9

presenting a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. <u>Matsushita</u>, 475 U.S. at 587, 106 S.Ct. at 1356. Although the Court will view all underlying facts and inference in a light most favorable to the nonmoving party, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." <u>Anderson v. Liberty Lobby</u>, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. <u>Celotex</u>, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. <u>Anderson</u>, 477 U.S. at 252, 106 S.Ct. at 2505. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. <u>Id.</u>, 447 U.S. at 247-48, 106 S.Ct. at 2505. If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

1.    **<u>Plaintiff's Motion for Default</u>**:

In his Motion for Default Judgment, Plaintiff states that the Court gave the BOP Defendants until November 12 to file a response to Plaintiff's Complaint. (Document No. 56.) Plaintiff indicates that BOP Defendants have failed to respond and Plaintiff should be granted default judgment. (<u>Id.</u>) In Response, BOP Defendant argue that they timely filed their response to

10

Plaintiff's Complaint on November 9, 2018. (Document No. 58.)

Rule 55(a) of the Federal Rules of Civil Procedure permits the entry of default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . .." By Order entered on October 9, 2018, the undersigned granted BOP Defendants' Motion for Extension of Time and directed BOP Defendants to file their Response to Plaintiff's Complaint on or before November 12, 2018. (Document No. 40.) On November 9, 2018, BOP Defendants filed their "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 54 and 55.) Thus, BOP Defendants filed a timely response to Plaintiff's Complaint. Accordingly, there is no basis for the entry of default judgment under Rule 55(a), and Plaintiff's Motion for Default (Document No. 56) should be denied.

**2.    FTCA Claim:**

**A.    The United States as a Party.**

In their Motion, BOP Defendants argue that they should be dismissed as to Plaintiff's FTCA claim and the United States substituted as the Defendant. (Document Nos. 54 and 55.) BOP Defendants explain that the United States is the only proper party in a suit under the FTCA. (Document No. 55, p. 21.) To the extent Plaintiff seeks to hold the individual Defendants responsible for their alleged negligence, BOP Defendants argue that the United States should be substituted as the sole defendant for Plaintiff's claims arising under the FTCA. (Id.) Plaintiff fails to address this issue in his Response in Opposition. (Document No. 63.)

The Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, *et seq.*, authorizes suits against the United States for damages for injuries or loss of property or

personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred. The FTCA provides at 28 U.S.C. § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

Inmates may file claims of liability against the United States but may not assert claims of personal liability against prison officials for violations of their constitutional rights under the FTCA. Carlson v. Green, 446 U.S. 14, 21 - 23, 100 S.Ct. 1468, 1472 -74, 64 L.Ed.2d 15 (1980). In order to maintain a case against the United States under the FTCA, Plaintiff must demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the State in which the action accrued. BOP Defendants contend they were acting within the scope of their employment as employees of the United States at the time of the incident out of which the claim arose. Plaintiff failed to address this issue in his Response. Furthermore, a review of the record reveals no allegation or indication that BOP Defendants were not acting within the scope of their employment as employees of the United States. The undersigned, therefore, recommends that the United States be substituted as a Defendant as to Plaintiff's FTCA claim against the individual BOP Defendants.

### B.    Failure to Exhaust:

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)(1996) requires that inmates exhaust available administrative remedies prior to filing civil actions though the administrative

process may not afford them the relief they might obtain through civil proceedings.[3] <u>Woodford v. Ngo</u>, 548 U.S. 81, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); <u>Porter v. Nussle</u>, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)(The Prison Litigation Reform Act's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes and whether they allege excessive force or some other wrong.); <u>Booth v. Churner</u>, 532 U.S. 731, 121 S.Ct. 1819, 1820,149 L.Ed.2d 958 (2001)("Under 42 U.S.C. § 1997e(a), an inmate seeking only money damages must complete any prison administrative process capable of addressing the inmate's complaint and providing some form of relief, even if the process does not make specific provision for monetary relief."). Exhaustion of administrative remedies is also required when injunctive relief is requested. <u>Goist v. U.S. Bureau of Prisons</u>, 2002 WL 32079467, *4, fn.1 (D.S.C. Sep 25, 2002), <u>aff'd</u>, 54 Fed.Appx. 159 (4th Cir. 2003), <u>cert. denied</u>, 538 U.S. 1047, 123 S.Ct. 2111, 155 L.Ed.2d 1088 (2003). "[A] court may not excuse a failure to exhaust" because the PLRA's mandatory exhaustion scheme "foreclose[es] judicial discretion." <u>Ross v. Blake</u>, ___ U.S. ___, 136 S.Ct. 1850, 1856-57, 195 L.Ed.2d 117 (2016)("[A] court may not excuse a failure to exhaust, even to take [special circumstances] into account."). But the plain language of the statute requires that only "available" administrative remedies be exhausted. <u>Id.</u> at 1855("A prisoner need not exhaust remedies if they are not 'available.'") In <u>Ross v. Blake</u>, the Supreme Court set forth three scenarios where the

---

[3] 42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted.

administrative process is considered "unavailable": (1) The administrative process "operates as a simple dead end -- with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) The administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) The "administrator thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." Ross, 136 S.Ct. at 1859-60; also see Dale v. Lappin, 376 F.3d 652, 656 (7th Cir. 2004); Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)(inmate lacked available administrative remedies for exhaustion purposes where inmate was unable to file a grievance because prison officials refused to provide him with the necessary grievance forms); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001)(allegations that prison officials failed to respond to his written requests for grievance forms were sufficient to raise an inference that inmate had exhausted his available administrative remedies.)

If an inmate exhausts administrative remedies with respect to some, but not all, of the claims he raises in a Section 1983, Bivens or FTCA action, the Court must dismiss the unexhausted claims and proceed with the exhausted ones. See Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 913, 166 L.Ed.2d 798 (2007)("The PLRA does not require dismissal of the entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. * * * If a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad.") It appears to be the majority view as well that exhausting administrative remedies after a Complaint is filed will not save a case from dismissal. See Neal v. Goord, 267 F.3d 116, 121-22 (2d Cir. 2001)(overruled on other grounds), a Section 1983 action, citing numerous cases. The rationale is pragmatic. As the Court stated in Neal, allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, if during the

pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. Neal, 267 F.3d at 123. In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the Court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court.. . .The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." Thus, the PLRA requires that available administrative remedies must be exhausted before the filing of a suit in Federal Court. It is further clear that the PLRA does not require that an inmate allege or demonstrate that he has exhausted his administrative remedies. See Jones v. Bock, supra; Anderson v. XYZ Correctional Health Services, 407 F.3d 674, 677 (4ᵗʰ Cir. 2005), *abrogated on other grounds by* Custis v. Davis, 851 F.3d 358 (4ᵗʰ Cir. 2017). Failure to exhaust administrative remedies is an affirmative defense. Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. Jones v. Bock, supra, 549 U.S. at 216, 127 S.Ct. at 921(Failure to exhaust is an affirmative defense that a defendant must generally plead and prove); also see Dale v. Lappin, 376 F.3d 652, 655 (7ᵗʰ Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a Bivens suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (Citations omitted)) The Court is not precluded, however, from considering at the outset whether an inmate has exhausted administrative remedies. "A court may sua sponte dismiss a complaint when the alleged facts in the complaint, taken as true, prove that the inmate failed to exhaust his administrative remedies." Custis v. Davis, 851 F.3d. 358, 361 (4ᵗʰ Cir. 2017); also see Banks v. Marquez, 694 Fed. Appx. 159 (4ᵗʰ Cir. 2017)(finding no error in the district court's decision to sua sponte dismiss petitioner's petition where petitioner explicitly admitted in his petition that he failed

to exhaust his administrative remedies).

As stated above, the FTCA is a limited waiver of sovereign immunity. This waiver is subject to the condition that an administrative claim must first be submitted to the appropriate agency and denied before suit can be filed. See 28 U.S.C. § 2675(a).[4] See also Bellomy v. United States, 888 F. Supp. 760 (S.D.W.Va. 1995). As a general matter, filing a timely administrative claim is jurisdictional and cannot be waived. Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994) (citing Henderson v. United States, 785 F.2d 121, 123 (4th Cir. 1986); Muth v. United States, 1 F.3d 246 (4th Cir. 1993); Gibbs v. United States, 34 F.Supp.2d 405 (S.D.W.Va. 1999). Thus, before an inmate can bring a claim under the FTCA, the inmate must exhaust procedures specified at 28 C.F.R. §§ 14.1 to 14.11 and 543.30 to 543.32. Additionally, the Court cannot hold the case in abeyance while a plaintiff presents an administrative tort claim with the appropriate agency.[5]

---

[4]  Title 28 U.S.C. § 2675(a) provides as follows:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

[5]  The administrative process which inmates must exhaust when they have complaints under the FTCA is spelled out at 28 C.F.R. §§ 14.1 - 14.11. To exhaust administrative remedies as required before filing an action under the FTCA, the inmate must first submit an administrative claim including a claim for money damages in a sum certain for the alleged injury sustained on a Standard Form 95 to the Federal agency whose activities gave rise to the claim. Id., § 14.2(a) and (b)(1). After investigation and examination and informal attempts at resolving the inmate's claim as the circumstances may require, Id., §§ 14.6 and 14.8, the agency may deny or approve the inmate's claim. If the agency denies the inmate's claim, she may file suit in the District Court within six months of the mailing of the denial. Id., § 14.9(a). The Director of the Federal Bureau of Prisons is authorized to settle meritorious administrative Federal tort claims by providing

See Plyer v. United States, 900 F.2d 41, 42 (4th Cir. 1990)("Since the district court has no jurisdiction at the time the action was filed, it could not obtain jurisdiction by simply not acting on the Motion to Dismiss until the period had expired."). 28 U.S.C. § 2401(b) provides that a tort claim must be presented to the appropriate federal agency within two years after the claim accrues and the lawsuit must be commenced within six months after the receipt of a final agency decision.

The United States contends that Plaintiff never filed an administrative tort claim with the agency regarding his medical treatment at FCI McDowell. (Document No. 55, pp. 22 – 23.) In support, the United States submits the Declaration of Ms. Tiffanie Little, a Legal Assistant for the Federal Bureau of Prisons. (Document No. 54-1, pp. 2 - 3.) Ms. Little declares that in her position she has access to SENTRY, the Bureau of Prisons' online system containing, among other things, information about inmates' administrative remedy filings and administrative tort claim filings. (Id., p. 2.) Specifically, Ms. Little states as follows in her Declaration (Id., p. 4.):

> 5.   Plaintiff exhausted administrative remedies regarding medical care for his wrist fracture at FCI McDowell.
>
> 6.   A search of BOP's database reveals that Plaintiff has filed no administrative tort claims with the BOP regarding his injury or his medical care at FCI McDowell.

(Id.) As Exhibits, Mr. Little attaches a copy Plaintiff's "Administrative Remedy Generalized Retrieval." (Id., pp. 16 – 24.) The United States, therefore, argues that Plaintiff's FTCA claim must be dismissed for failure to exhaust. (Id.) In his Response, Plaintiff acknowledges that he did not exhaust his administrative remedies concerning his FTCA claim by filing an administrative tort claim. (Document No. 63, p. 14.) Plaintiff explains that he filed a "BP 8, 9, 10, and 11," but he

---

monetary compensation. 28 C.F.R. §§ 0.96(k) and 0.172.

"did not know it was an administrative remedy that was needed" for an FTCA claim. (Id.)

Based upon a review of the record, the undersigned finds that Plaintiff failed to properly exhaust his administrative remedies pursuant to the PLRA. Although Plaintiff contends that he properly filed a BP-8, BP-9, BP-10, and BP-11, the exhaustion requirements concerning FTCA and Bivens actions differ. See Davis v. United States, 2007 WL 3473275 (N.D.W.Va. Nov. 13, 2007); Murphy v. Inmate Systems Management, 2008 WL 793631 (S.D.W.Va. Mar. 20, 2008). Having examined the record, the Court finds that the administrative remedies filed by Plaintiff relate to the exhaustion of his Bivens claim, not his FTCA claim. Plaintiff fails to produce any documents indicating that he exhausted his FTCA claim. Additionally, there is no indication or allegation by Plaintiff that the administrative tort claim process was unavailable. To the extent Plaintiff is arguing that he should be excused from exhaustion due to the futility of filing an administrative tort claim asserting the same claim denied in his administrative remedies, his argument is without merit. The United States Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements. . . ."[6] Booth v. Churner, 532 U.S. 731, n. 6, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001); also see Massey, 196 F.3d at 727("[T]here is no futility exception to the PLRA's exhaustion requirement."); Goodwin v. Beasley, 2011 WL 835937, * 3 (M.D.N.C. March 3, 2011)("Courts have squarely rejected prisoners' attempts to

---

[6] Unlike the exhaustion requirement for Section 1983 and Bivens actions, the exhaustion requirement for Section 2241 Petitions are judicially imposed. See Moscato v. Federal Bureau of Prisons, 98 F.3d 757 (3rd Cir. 1996); McCallister v. Haynes, 2004 WL 3189469 (N.D.W.Va. 2004). Since the exhaustion requirement for a Section 2241 Petition is judicially imposed, the Court has discretion to waive that requirement in certain circumstances. See LaRue v. Adams, 2006 WL 1674487, * 8 (S.D.W.Va. June 12, 2006)(citing Smith v. Angelone, 111 F.3d 1126, 1129-31 (4th Cir.), cert. denied, 521 U.S. 1131, 118 S.Ct. 2, 138 L.Ed.2d. 1036 (1997)). Courts, therefore, have recognized that exhaustion may be excused under certain circumstances, such as by a showing of futility or irreparable injury.

bypass the exhaustion requirements by merely arguing lack of knowledge about the grievance process."); Smith v. Boyd, 2008 WL 2763841, * 1 (D.S.C. July 11, 2008)("This court cannot waive the exhaustion requirement, which was specifically mandated by Congress, based on Plaintiff's ignorance of the requirement or any perceived futility or inadequacy with the administrative grievance process."); Jacocks v. Hedrick, 2006 WL 2850639, * 5 (W.D.Va. Sept. 29, 2006)(finding that inmate's alleged pain and suffering after the loss of his eye were not special circumstances that would excuse his failure to exhaust where he had filed prior grievances complaining of other matters). Based on the foregoing, the undersigned recommends that Plaintiff's FTCA claim be dismissed in view of his failure to exhaust prior to filing his Complaint.

**3.    <u>Failure to satisfy the requirements of the MPLA.</u>**

In the present case, Plaintiff alleges that Defendant Meade and BOP Defendants' negligent acts occurred in the State of West Virginia. Accordingly, West Virginia State law applies. Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6.[7] Compliance with West Virginia Code § 55-7B-6 is

---

[7]    West Virginia Code § 55-7B-6 provides the following in pertinent part:

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant

mandatory prior to filing suit in federal court. <u>Stanley v. United States</u>, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); <u>also</u> <u>see</u> <u>Starns v. United States</u>, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap applies to claims brought against the United States under the FTCA). West Virginia Code § 55-7B-6(c), however, provides that no screening certificate of merit is necessary where "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care."

Plaintiff alleges that Defendant Meade and prison employees acted with negligence in diagnosing and providing medical treatment for his hand fracture and non-union. In their Motions, the United States and Defendant Meade contend that Plaintiff's claim should be dismissed because he failed to timely and properly file a notice of claim and a screening certificate of merit pursuant to the MPLA. (Document No. 34, pp. 10 – 14 and Document No. 55, pp. 23 – 24.) Plaintiff failed to file a Response disputing the foregoing.

---

will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of Rule 15 of the Rules of Civil Procedure.

Under West Virginia law, "[i]t is the general rule that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, Roberts v. Gale, 149 W.Va. 166, 139 S.Ed.2d 272 (1964). Expert testimony, however, is not required "where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience." Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739 (2006). The MPLA provides as follows concerning claims "based upon a well-established legal theory of liability":

> Notwithstanding any provision of this code, if a claimant or his or her counsel, believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

West Virginia Code § 55-7B-6(c). In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858.

Plaintiff does not dispute that he failed to serve the United States or Defendant Meade with a screening certificate of merit prior to filing suit. To the extent Plaintiff claims that his case falls

21

within the exception to the screening certificate of merit requirement, the undersigned will consider such. Unlike the facts in <u>Johnson</u>, Plaintiff's allegations of negligence are complex and expert testimony is necessary. <u>See</u> <u>Giambalvo v. United States</u>, 2012 WL 984277 * 4 (N.D.W.Va. March 22, 2012)(finding that *Johnson* "is a rare exception to 'the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses.'"). In the instant case, Plaintiff contends that medical staff failed to provide appropriate medical treatment for his minimally displaced scaphoid fracture resulting in a nonunion of the fracture.[8] The appropriate treatment of a minimally displaced scaphoid fracture and the cause of a resulting nonunion is not within the common knowledge of lay jurors. Plaintiff further contends that Defendants failed to timely recognize and treat the nonunion and prescribed appropriate pain medication. When to cease conservative treatment and pursue surgical options concerning a facture and nonunion is not within common knowledge of lay jurors. Neither is it within a lay juror's common knowledge as to the appropriate type and dosage of pain medication for such a condition. Plaintiff is clearly alleging a breach in the standard of care. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55-7B-6(c). The undersigned, therefore, recommends that the United States and Defendant Meade's Motion to Dismiss be granted as to Plaintiff's negligence claim.

**4.    <u>Bivens Claim</u>:**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." <u>Turner v. Safley</u>, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A <u>Bivens</u> action is a judicially created damages remedy which is designed to vindicate violations of

---

[8] A scaphoid fracture is a break in one of the small bones of the wrist.

constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under color of federal law.[9] The United States Supreme Court has held that an inmate may name a federal officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to Bivens. See Wilson v. Seiter, 501 U.S.

---

[9] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However, <u>Bivens</u> claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. See <u>FDIC v. Meyer</u>, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); <u>Berger v. Pierce</u>, 933 F.2d 393, 397 (6th Cir. 1991); <u>Reinbold v. Evers</u>, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

### A.    Defendant Lucas is entitled to absolute immunity.

In her Motion, Defendant Lucas argues that she is a United States Public Health Service Employee and is entitled to absolute immunity. (Document No. 55, pp. 18 – 19.) In support, Defendant Lucas attaches her Declaration stating as follows: "I am a Commissioned Officer in the United States Public Health Service, and have been such at all times relevant to this case. (Document Nos. 54-1, p. 227.) In his Response, Plaintiff fails to specifically address the above argument. (Document No. 63.) Plaintiff, however, continues to state that he notified Defendant Lucas of the lack of adequate medical care and he was "not provided relief." (<u>Id.</u>, pp. 12 – 13.)

> Title 42 U.S.C. § 233(a) provides as follows:
>
> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 . . . for damages for personal injury, including death, resulting from the performance of medical, surgical, dental or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

Thus, Congress made proceedings under the Federal Tort Claims Act the sole avenue to seek relief against a Public Health Service employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment. The United States Supreme Court has held that "[t]he immunity provided by § 233(a) precludes *Bivens* actions against individual [Public Health Service] officers or employees for harms arising out of

24

constitutional violations committed while acting within the scope of their office or employment."
Hui v. Castaneda, 559 U.S. 799, 130 S.Ct. 1845, 1847, 176 L.Ed.2d 703 (2010)(stating that
Section 233(a) "plainly precludes a *Bivens* action against petitioners by limiting recovery for
harms arising from the conduct at issue to an FTCA action against the United States.") Defendant
Lucas holds the position of the Health Services Administrator ["HSA"] at FCI McDowell. Thus,
Plaintiff alleges that Defendant Lucas is responsible for failing to ensure that he was provided
appropriate medical care. Defendant Lucas was clearly acting within the scope of her employment
when performing functions pertinent to her position, such as her administrative oversight and
supervision of the Health Services Department. Based on the foregoing, the Court finds that
Defendant Lucas was a Commissioned Officer in the United States Public Health Service during
the time period relevant to this Complaint and has absolute immunity from suit for all claims
arising from the medical care provided to Plaintiff. The Court, therefore, respectfully recommends
that Defendants Lucas' "Motion to Dismiss, or in the Alternative Motion for Summary Judgment"
be granted. The undersigned finds it unnecessary to consider the other reasons which Defendants
Lucas has submitted for dismissal as to Plaintiff's Bivens claim.

**B.     No evidence of deliberate indifference.**

In his Complaint, Plaintiff contends that BOP Defendants and Defendant Meade acted
with deliberate indifference in violation of the Eighth Amendment by failing to provide Plaintiff
with appropriate medical treatment for his broken hand. Specifically, Plaintiff alleges that he was
not timely and appropriately examined by medical staff. Plaintiff complains that he was not timely
examined by a doctor, medical staff delayed the ordering of his initial MRI, and refused to provide
adequate pain medication. Plaintiff alleges that the lack of appropriate medical care caused his

hand to heal improperly resulting in surgery. Finally, Plaintiff complains that medical staff failed to follow the recommendations of his orthopedic surgeon concerning the ordering of a second MRI and providing pain medications.

In his Motion, Defendant Meade argues Plaintiff failed to allege that Defendant Meade caused him to suffer a serious physical injury or that he subjectively knew that Plaintiff faced a substantial risk of serious harm and failed to take reasonable measures. (Document No. 34, pp. 5 – 10.) Defendant Meade states that "plaintiff is complaining about the exercise of [Defendant] Meade's medical judgment." (Id., p. 7.) Defendant Meade further states that he had no control over Plaintiff having access to a doctor because he was acting as a "physician extender for a private orthopedic practice contracted to provide care to inmates at [FCI] McDowell." (Id., p. 9.) Defendant Meade contends that "[a]t best, the plaintiff alleges that [Defendant] Meade negligently placed his wrist in a cast without a diagnosis by a doctor and without giving him pain medication." (Id., p. 10.) Defendant Meade notes that Plaintiff acknowledges that an x-ray confirmed that he broke his hand. (Id.) Accordingly, Defendant Meade argues that Plaintiff's deliberate indifference claim must be dismissed. (Id.)

In Response, Plaintiff argues that Defendant Meade was deliberate indifferent because he "made repeated references to it's not healing correctly [and] no one including him tried to get me any medical help from someone qualified." (Document No. 37, p. 1.) Plaintiff states Dr. Charron's "statement when viewing the x-ray 120 days after the break was 'that's never going to heal right' without surgery, but will know after finally viewing my MRI." (Id.) Therefore, Plaintiff argues that Defendant Meade acted with deliberate indifference. (Id.)

In their Motion, BOP Defendants argue that Plaintiff cannot establish deliberate

indifference. (Document No. 55, pp. 11 – 15.) BOP Defendants contend that Plaintiff's "disagreement over the appropriate course of treatment does not rise to the level of a constitutional violation." (Id., p. 14.) BOP Defendants note that Plaintiff was evaluated and provided a conservative course of treatment until it was determined that surgery was warranted. (Id., p. 15.) BOP Defendants contend that "Plaintiff's disagreement with his course of treatment or his belief that he should have had an MRI and surgical consult sooner, does not state a cognizable Eighth Amendment claim." (Id.)

In Response, Plaintiff states that PA Stark acted with deliberate indifference because she "did not implement the urgent and emergency care policy but treated my injuries as routine." (Document No. 63, p. 1.) Plaintiff complains that PA Stark informed him she thought hiw wrist was sprung and she failed to provide a split or brace. (Id.) Plaintiff also contends that PA Carothers treated Plaintiff's fracture as routine and only provided him with three days of Tylenol. (Id., p. 2.) Plaintiff claims that even after his x-ray revealed the fracture, he "was not admitted to the Emergency Room or evaluated by a doctor." (Id., pp. 3 and 19.) Plaintiff complains that PA Carothers arranged for Plaintiff to be evaluated by APRN-NP Meade, who is not a doctor. (Id., p. 4.) Plaintiff asserts that APRN-NP Meade failed to acknowledge Plaintiff's ulnar styloid fracture. (Id.) Plaintiff argues that although he was informed that it should take 90 days for his scaphoid fracture to heal, his scaphoid fracture was not corrected for approximately "6 months and 23 days." (Id.) Plaintiff claims that during this period of time, he was only provided with ten days of pain medication and was instructed to buy over-the-counter medication from the commissary. (Id., p. 4.) Plaintiff complains that PA Carothers placed him in a left-hand wrist brace. (Id., p. 6.) Plaintiff argues that Dr. Charron requested an MRI and prescribed pain medication, but Plaintiff

failed to receive either. (Id., pp. 7 and 16.) Plaintiff alleges that BOP Defendants were deliberately indifferent by delaying his surgery until "73 days after Dr. Charron's orders." (Id.) Plaintiff complains that BOP Defendants failed to provided Plaintiff with the post-surgery pain medications prescribed by Dr. Charron. (Id.) Plaintiff further claims that he was not provided any pain medication upon his returning to the prison following his surgery. (Id., p. 8.) Plaintiff states that he was required to wait until the following morning to receive medication for pain. (Id.) Concerning physical therapy, Plaintiff complains that he did not start physical therapy until approximately two months after such was ordered by Dr. Charron. (Id., p. 9.)

As a general matter, punishments prohibited under the Eighth Amendment include those that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Inmates' claims, therefore, that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987); Moore v. Winebrenner, 927 F.2d 1312, 1316 (4th Cir. 1991) cert. denied, 502 U.S. 828, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991)(Stating that supervisory liability may be imposed where prison supervisors "obdurately," "wantonly," or "with deliberate indifference" fail to address a known pervasive risk

of harm to an inmate's health or safety). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") Therefore, Plaintiff must first allege and eventually establish an objectively "sufficiently serious" deprivation. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must

therefore allege and establish that each Defendant was aware that there was a substantial risk to Plaintiff's health or safety and that Defendant disregarded the serious physical consequences.

Plaintiff alleges that Defendants acted with deliberate indifference in failing to provide adequate treatment for his hand fracture. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Plaintiff alleges that his condition caused continuous severe pain and suffering. Accordingly, the undersigned will assume for purposes of the motions that Plaintiff's injuries were serious enough to give rise to an Eighth Amendment claim.

Next, the undersigned will consider whether Defendant Meade and BOP Defendants acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends Defendant Meade and BOP Defendants acted with deliberate indifference in failing to provide him with timely and appropriate treatment for his hand fracture. On June 22, 2017, Plaintiff reported to Health Services complaining of right wrist pain. (Document No. 54-1, pp. 92 - 96.) Plaintiff explained that he fell the day before while playing basketball and had used ice with no relief. (Id.) Plaintiff was examined by Physician Assistant ("PA") Stark, who ordered x-rays, administered a Toradol injection, and prescribed 800 mg Ibuprofen for three times per day for three days. (Id.) The next morning, on June 23, 2017, PA Chandra Carothers made an administrative note indicating that Plaintiff's wrist was placed in a brace, he was provided "night stock" Tylenol until it could be confirmed whether he had a fracture, and given a MDS off work until June 27, 2017.

30

(Id., p. 91.) That afternoon, X-rays were performed revealing the following: "Minimally displaced scaphoid fracture through scaphoid waist with small adjacent bony fragments. There is soft tissue swelling on the right wrist. There is an old ulnar styloid fracture with nonunion." (Id., pp. 201-03.) Plaintiff's chest x-ray revealed no evidence of rib or sternal fracture. (Id., p. 205.) On June 27, 2017, PA Stark wrote an orthopedic consult for evaluation and management of Plaintiff's right scaphoid fracture. (Id., p. 90.) On June 30, 2017, Plaintiff was evaluated by an onsite orthopedic clinician Advanced Practice Registered Nurse ("APRN") and Nurse Practitioner ("NP") Adam Meade. (Id., p. 197-99.) APRN-NP Meade noted that Plaintiff was placed in a thumb spica splint after the referral to ortho and the x-rays revealed a scaphoid fracture with minimal displacement. (Id.) APRN-NP Meade noted that the plan was to place Plaintiff in a thumb spica cast to be worn for the next month and after one month the cast would be removed and additional x-rays taken. (Id.) Plaintiff was instructed to do no recreation or work and no use of the right hand. (Id.) APRN-NP Meade noted that Plaintiff's injury would require three months to heal with three months of casting. (Id.) ARPN-NP Meade's supervising physician, Dr. S. Brett Whitfield, Orthopedic Surgeon, noted that he discussed the above case with Meade and agreed with the treatment plan. (Id., p. 199.) By Administrative Note entered the same day, PA Carothers ordered follow-up x-rays after noting that Plaintiff was seen by APRN-NP Meade. (Id., p. 89.) Specifically, PA Carothers directed that follow-up x-rays be performed on July 28, 2017, August 25, 2017, and September 22, 2017. (Id.)

Approximately one month later, on July 28, 2017, Plaintiff was again evaluated by APRN-NP Meade and x-rays were performed without casting. (Id., pp. 190 and 193.) APRN-NP Meade noted that the x-ray results revealed minimal displacement of the scaphoid fracture, a slight

change when compared to the previous films. (Id.) APRN-NP Meade noted that it appeared that Plaintiff had been "messing with the cast" and Plaintiff acknowledged actively trying to take off the cast and using his fingers to pick up objects, which "we do not want him to do as it does appear like the fracture has moved ever so slightly." (Id.) APRN-NP Meade placed Plaintiff back in the same type of cast and noted that Plaintiff would return in one month for a follow-up and repeat x-rays. (Id.) Dr. Whitfield noted that he discussed the above with APRN-NP Meade and agreed with the treatment plan. (Id., p. 190.) By Administrative Note entered the same day, PA Carothers ordered follow-up x-rays after noting that Plaintiff was seen by APRN-NP Meade. (Id., p. 88.)

On August 25, 2017, Plaintiff was evaluated by APRN-NP Meade and repeat x-rays were performed. (Id., pp. 185 and 188.) APRN-NP Meade noted that the x-rays revealed minimal healing. (Id.) APRN-NP Meade removed the cast and placed Plaintiff in a thumb spica splint, which would be removed only to shower. (Id.) Plaintiff was instructed to avoid gripping, pulling and pushing. (Id.) APRN-NP Meade ordered a CT scan and noted that Plaintiff would return for further evaluation in a month. (Id.) Dr. Whitfield noted that he discussed the above with APRN-NP Meade and agreed with the treatment plan. (Id., p. 185.) By Administrative Note entered the same day, PA Carothers submitted a consult request for a CT scan after noting that APRN-NP Meade did not feel that the fracture was healing at the rate it should be. (Id., p. 87.) Plaintiff's CT scan was conducted at Beckley Appalachian Regional Healthcare ("BARH") on September 18, 2017, and Plaintiff returned to the institution on the same day. (Id., p. 83.) The CT revealed a fracture to the mid-navicular bone in good position alignment without displacement or sclerosis. (Id., p. 183.)

On September 22, 2017, Plaintiff was evaluated by APRN-NP Meade for follow-up. (Id., p. 179.) APRN-NP Meade noted that Plaintiff complained of some mild pain. (Id.) Upon examination, APRN-NP Meade noted mild tenderness and full range of motion without significant pain. (Id.) A strength test, however, was deferred. (Id.) APRN-NP Meade noted the CT scan demonstrated a fracture of the mid-scapular bone in good position and alignment without displacement or sclerosis. (Id.) APRN-NP Meade noted that he did not see any callus bridging from within the fracture site, but he would have Orthopedic Surgeon Whitfield to review to confirm.[10] (Id.) APRN-NP Meade advised Plaintiff that conservative treatment could continue, but they would be forced to consider surgery if it did appear the fracture was not healing. (Id.) APRN-NP Meade noted that he would take the CT for review by Dr. Whitfield and "get back in touch with Ms. Carothers either Monday or Tuesday about what to do with Mr. Boggs." (Id.) Dr. Whitfield noted that he discussed the above case with Meade and agreed with the treatment plan. (Id., p. 179.) By Administrative Note entered on September 27, 2017, PA Carothers noted that she made a consult request for Plaintiff to see a hand specialist. (Id., pp. 79 - 82.) PA Carothers indicated that plaintiff had been treated by ortho for the past three months with casting and follow-up x-rays for his right scaphoid fracture and a CT scan conducted the prior week was reviewed by ortho, who recommended follow-up with a hand specialist due to delayed union of the scaphoid fracture. (Id.)

By Administrative Note entered on October 27, 2017, PA Carothers stated Plaintiff requested to remove the half cast he had been wearing for protection of the fracture while he waits to see the hand specialist. (Id., p. 78.) PA Carothers noted that she contacted APRN-NP Meade

---

[10] Bridging callus is the new bone that forms across a fracture during healing.

for guidance, and he recommended that Plaintiff be placed in a thumb spica wrist brace. (Id.) It was noted that Plaintiff was placed in the brace and it was reiterated the importance of refraining from recreation activities involving pushing, pulling, or anything that strain the wrist. (Id.) It was noted that although Plaintiff acknowledged his understanding, he immediately asked if he could be released to go to recreation. (Id.) Plaintiff further requested Tylenol for pain. (Id.) PA Carothers prescribed Plaintiff Tylenol 325 mg four times daily for seven days. (Id.)

On October 30, 2017, Plaintiff had a consult with Dr. Charron at Raleigh Orthopedics. (Id., pp. 73, 176-77.) Dr. Charron noted that the x-ray results revealed a scaphoid nonunion. (Id., Document No. 176.) Dr. Charron stated that he would likely recommend surgery for debridement of the fracture site, bone grafting and stabilization with an Acutrak screw, but he wanted an MRI prior to making the final determination. (Id.) Dr. Charron noted that Plaintiff indicated that he had a prior MRI scan, but Dr. Charron stated "we are unable to locate the MRI scan." (Id.) By Administrative Note entered on November 3, 2017, PA Carothers indicated that she had reviewed the notes from Dr. Charron's office and had attempted to call them on November 2, 2017, without answer or the ability to leave a voicemail. (Id., p. 72.) PA Carothers, however, indicated that she was able to reach Raleigh Orthopedics on November 3, 2017, and she explained that Plaintiff had already had a CT scan of his wrist completed. (Id.) Dr. Charron's office advised that an updated encounter with a new plan would be sent to the prison after the CT disc was received and the reports were reviewed. (Id.) PA Carothers finally noted that she also contacted Dr. Whitfield's office and asked that the CT disc, report, and last ortho note be forwarded to Dr. Charron's office. (Id.)

By Administrative Note entered on November 30, 2017, PA Carothers indicated that

Case 1:18-cv-00729 Document 74 Filed 05/15/19 Page 35 of 49 PageID #: 685

Plaintiff had been evaluated by Dr. Charron, his CT scan and previous ortho notes were reviewed, and Dr. Charron recommended surgical repair of the right writ to correct the non-healing of the scaphoid fracture. (Id., pp. 68 - 70.) PA Carothers noted that she requested authorization for the surgery and any related follow-ups. (Id.) On January 10, 2018, Dr. Charron performed surgery on Plaintiff's hand at Raleigh General Hospital. (Id., pp. 164-69.) Specifically, Dr. Charron repaired the right scaphoid nonunion with an Acutrak implant and micro screw. (Id.) Plaintiff was discharged the same day and returned to FCI McDowell. (Id., pp. 63 – 66, 166-67.) Plaintiff was evaluated by RN Walters on January 11, 2018, who gave him 2 tablets of Tylenol 3 per Dr. Sathre's order. (Id.) Dr. Sathre prescribed Tylenol 3 for seven days. (Id., p. 67.) By Administrative Note entered on January 13, 2018, RN Jackie Price noted that Plaintiff was refusing Tylenol 3 due to being nauseous and requested over-the-counter medications. (Id., pp. 59 – 60.) PA Carothers was notified of the foregoing and prescribed "night stock Tylenol" and Tylenol 3 was discontinued. (Id.) On January 19, 2018, PA Carothers contacted Dr. Charron's office and was advised that she could remove Plaintiff's staples and place steri-strips over the site. (Id., p. 58.) PA Carothers, therefore, removed Plaintiff's staples, placed steri-strips over the site, and noted no sign of infection. (Id.) PA Carothers further noted that she had contacted the scheduling contractor regarding the scheduling of a follow-up appointment with Dr. Charron. (Id.) On January 31, 2018, Dr. Sathre ordered a right writ x-ray per Dr. Charron's request. (Id., p. 57.) The x-ray was performed the same day, revealing the following: "Nondisplaced fracture of the waist of the scaphoid is again noted. Fracture line is still visible. There is an interval single screw fixation across the fracture with hardware intact without hardware complication. There is again a nonunion old fracture of the ulnar styloid. No new fractures. No joint malalignment." (Id., pp.

173-74.) On February 2, 2018, Plaintiff had his follow-up appointment with Dr. Charron. (Id., pp. 56 and 171.) Dr. Charron noted that the wound look good and the x-rays following the surgery showed that the screw was stabilizing the scaphoid in good position. (Id.) Dr. Charron instructed Plaintiff not to lift weights for the next five weeks and to follow-up in five weeks with repeat x-rays. (Id.)

Per Dr. Charron's request, PA Carothers ordered a follow-up x-ray on March 1, 2018. (Id., p. 55.) The x-rays were conducted the next day on March 2, 2018, revealing the following: "Nondisplaced fracture of the waist of the scaphoid with single screw fixation hardware in anatomic alignment. Fracture line is visible. No hardware complication. Old nonunion fracture deformity of the ulnar styloid with 6mm corticated ossific density without significant displacement. No other fractures. No joint malalignment." (Id., pp. 159-60.) On March 6, 2018, Dr. Charron saw Plaintiff for a follow-up appointment. (Id., pp. 154.) Plaintiff reported some right wrist pain that was not improving. (Id.) Dr. Charron noted that the x-ray showed no significant external callous formation and no halo formation around the screw. (Id.) Upon examination, there was no redness around the wrist, no swelling, and not wrist effusion. (Id.) Plaintiff had a normal range of motion and intact motor function in the right hand but noted pain with motor testing. (Id.) Dr. Charron instructed Plaintiff to follow-up in four weeks with additional x-rays to be performed and wrote a physical therapy referral. (Id., pp. 152 and 154.) By Medical Trip Return Encounter entered on the same day, RN Nicole Dufour noted that Plaintiff returned from his appointment with Dr. Charron and he received new orders for Naproxen, labs, and physical therapy. (Id., pp. 51 – 53.) On the same day, Plaintiff was prescribed Naproxen and labs were ordered. (Id.)

On March 14, 2018, Plaintiff was evaluated in the Chronic Care Clinic by Dr. Sathre. (Id., pp. 47 – 49.) Dr. Sathre noted no acute concerns and that Plaintiff was taking Naproxen. (Id.) Dr. Sathre examined Plaintiff noting that the right-hand wrist equivocal palpation discomfort in the scaphoid region, no skin lesions, and distal neurovascular intact. (Id.) Dr. Sathre renewed Plaintiff's prescribed Naproxen 500 mgs, one tablet twice per day, and ordered routine lab work. (Id.) On March 22, 2018, PA Carothers wrote a consultation for physical therapy per Dr. Charron's recommendation. (Id., p. 46.) Specially, the request was for a physical therapy evaluation so Plaintiff could be taught an at-home physical therapy regimen. (Id.) PA Carothers also requested an additional x-ray per Dr. Charron's recommendation. (Id., p. 45.) Follow-up x-rays were performed on April 4, 2018, revealing the following: "Nondisplaced scaphoid waist fracture with single screw fixation again noted without interval healing indicating nonunion. Nonunion ulnar styloid fracture again noted. No new fractures. No join malalignment." (Id., p. 156-57.)

On April 25, 2018, Plaintiff attended his initial physical therapy evaluation. (Id., p. 43.) Upon examination, the physical therapist noted that Plaintiff demonstrated within functional limits of wrist/hand with active range of motion but showed decreased strength in the wrist/hand. (Id., pp. 144-46.) Plaintiff was provided handouts and written instruction on exercises, which included a stretch and strengthening exercises. (Id.) The physical therapist noted that Plaintiff's rehabilitation potential was good. (Id.) On May 8, 2018, Plaintiff presented to physical therapy callout and completed the exercises as described per the physical therapist's instructions. (Id., p. 42.) On May 14, 2018, Plaintiff reported to sick call complaining of pain in his wrist and thumb. Plaintiff, however, left Health Services before being seen. (Id., p. 41.)

By Administrative Note entered on June 5, 2018, PA Carothers indicated that she wrote a consult request for an additional follow-up with Dr. Charron and x-rays. (Id., p. 39.) PA Carothers noted that Plaintiff "had surgery completed to fix a non-health wrist fracture and has been completing physical therapy onsite with therabands. (Id., pp. 39 – 40.) A follow-up x-ray was performed on June 20, 2018, revealing no change since prior x-ray conducted on April 4, 2018.[11] (Id., pp. 140-41, 223.) On August 3, 2018, Plaintiff had a follow-up appointment with Dr. Charron. (Id., pp. 208-10.) Plaintiff reported that Dr. Charron did not release him yet, but did approve Plaintiff to resume working out. (Id.) On September 24, 2018, Plaintiff was again seen by Dr. Charron for a follow-up appointment. (Id., pp. 37 – 38.) Dr. Charron noted that Plaintiff had x-rays taken that day, which showed his fracture and his hardware in "good position." (Id.) Dr. Charron noted "evidence of bony bridging at the fracture site . . . some reabsorption around the screw in the distal fragment, but I do think he has healed." (Id.) Upon examination, Dr. Charron noted "some stiffness and soreness in his right wrist and hand." (Id.) Dr. Charron recommended that Plaintiff continue physical therapy for range of motion and directed him to follow-up on an as-needed basis. (Id.) Dr. Charron noted that "I feel he has a 10 percent permanent partial impairment of the right wrist." (Id.) Two days later, on September 26, 2018, PA Stark completed a consult for physical therapy. (Id., p. 35.)

The Court finds that BOP Defendants and Defendant Meade did not act with deliberate indifference in providing medical treatment regarding Plaintiff's hand facture. The record reveals

---

[11] The x-ray report stated as follows: "No interval change since prior right wrist exam on 4/4/18. Single screw fixation of scaphoid waist fracture in anatomic alignment. Fracture line is still visible. No interval bony bridging or healing. Hardware is intact without hardware complication. Old nonunion fracture of the ulnar styloid again noted without change in alignment. No new fractures. No joint malalignment." (Document No. 54-2, pp. 140-41.)

that BOP Defendants evaluated Plaintiff and provided treatment following each sick-call request and consistently scheduled follow-ups with either Defendant Meade or Dr. Charron. Defendants consistently evaluated Plaintiff's condition, ordered x-rays and a CT scan, referred Plaintiff to an Orthopedist, and prescribed medications. First, Plaintiff contends that BOP Defendants acted with deliberate indifference because his initial treatment was untimely and inadequate, he was not transported to the local ER, or evaluated by a doctor. The record reveals that Plaintiff was examined by a Physician Assistant (PA Stark), who ordered x-rays, administered a Toradol injection, and prescribed 800 mg Ibuprofen for three times per day for three days. The following morning, PA Carothers noted that Plaintiff's wrist was placed in a brace, he was provided Tylenol, and give time off work. In the early afternoon, x-rays were conducted revealing a minimally displaced scaphoid fracture and old ulnar styloid fracture with nonunion. PA Stark wrote an orthopedic consult and Plaintiff was examined by an onsite orthopedic APRN-NP (Defendant Meade) seven days later. Defendant Meade confirmed that Plaintiff had been placed in a thumb splint and reviewed x-rays. Defendant Meade placed Plaintiff in a thumb spica cast and directed him to return in one month for follow-up x-rays and re-casting. Defendant Meade noted that it would take 3 months for the scaphoid facture to heal and require three months of casting. Defendant Meade's supervising physician, Dr. Whitfield, noted that he discussed this case with Meade and agreed with the treatment plan. Thus, the record reveals that Plaintiff was evaluated by a PA the day he reported his injury, and within seven days Plaintiff was evaluated by an orthopedic APRN-NP, whose treatment plan was reviewed and approved by an orthopedic surgeon. There is no indication the BOP Defendants or Defendant Meade knowingly disregarded Plaintiff's alleged need to be seen by a doctor. Furthermore, the record reveals that Defendants

provided Plaintiff with pain medication. Although Plaintiff may disagree with the amount and type of pain medication provided, there is no indication that Defendants knew of and disregarded Plaintiff's need for pain medication. An inmate's disagreement with his medical care or the course of treatment for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.") Plaintiff further complains that, prior to receiving x-ray results, PA Stark initially misdiagnosed his fracture as a spring. A negligent medical diagnosis, however, is insufficient to establish deliberate indifference. Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008); also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Plaintiff's foregoing allegations fail to establish deliberate indifference by Defendant Meade or BOP Defendants.

Next, Plaintiff argues that Defendant Meade and BOP Defendants acted with deliberate indifference concerning the follow-up care for his hand fracture causing it to heal improperly. The record reveals that BOP Defendants complied with Defendant Meade's plan of evaluation and the performance of x-rays once per month for three months. Additionally, Defendant Meade clearly examined Plaintiff once per month for three months, reviewed the x-ray results, and

directed re-casting of Plaintiff's hand. During Plaintiff's two-month follow-up, Defendant Meade noted that x-ray results revealed minimal healing of the scaphoid fracture. Thus, Defendant Meade ordered a CT scan and directed Plaintiff to follow-up in one month. On the same day, PA Carothers submitted a consult request for the CT scan. The consult request was subsequently approved, and Plaintiff's CT scan was performed at an outside facility approximate three weeks after it was ordered by Defendant Meade. The CT scan revealed a mid-scaphoid fracture[12] in good position alignment without displacement. During Plaintiff's three-month follow-up, Defendant Meade reviewed Plaintiff's CT scan results and noted that Plaintiff's scaphoid fracture did not appear to be healing. Defendant Meade indicated that he would have Dr. Whitfield review the CT scan to confirm. Less than one week later, Defendant Meade advised BOP medical staff that Dr. Whitfield confirmed the non-healing and PA Stark submitted a consult request for Plaintiff to be seen by a hand specialist for consideration of surgery. Approximately one month after submitting the consult request, Plaintiff had his appointment with Dr. Charron (hand specialist). The foregoing does not exhibit that Defendant Meade or BOP Defendants knew of, and disregarded, necessary treatment for Plaintiff's scaphoid fracture. Initially, Defendants pursued a conservation

---

[12] Plaintiff appears to argue that he had multiple fractures to his hand. (Document No. 63, p. 20.) Plaintiff relies upon the x-ray results referencing the scaphoid bone and the CT scan results referencing the navicular bone. Plaintiff, however, is incorrect in his belief that the foregoing indicates multiple fractures. The scaphoid bone is also known as the navicular bone. Therefore, both the x-ray and CT scan results are referring to the same bone and fracture. Plaintiff further alleges that he had ulnar styloid fracture that Defendants failed to treat. The record, however, indicates that the ulnar styloid fracture was an "old" facture. Therefore, the "old" fracture was not caused by Plaintiff's fall on June 21, 2017. Plaintiff further acknowledges that his ulnar fracture was "not known to me." (Document No. 37, p. 1.) Thus, there is no indication that the nonunion of Plaintiff's "old" ulnar fracture was symptomatic or required treatment. Plaintiff's mere speculation that the "old" ulnar fracture required treatment because it was revealed on x-ray results is insufficient to constitute a constitutional violation.

41

treatment plan of monthly examination, x-rays, and re-casting. Upon review of Plaintiff's x-ray results at his two-month follow-up appointment, Defendant Meade noted that the scaphoid fracture did not appear to be healing. Defendant Meade and BOP Defendants, however, did not disregard the foregoing. Defendants ordered a CT scan, and upon receiving the results confirming the lack of healing, Defendants immediately began the process of referring and scheduling Plaintiff an appointment with a hand specialist for consideration of surgery. Plaintiff's allegations regarding the foregoing establish nothing more than his mere disagreement with his medical care, which is insufficient to establish deliberate indifference. See Wright, 766 F.2d at 849.

Finally, Plaintiff argues that BOP Defendants acted with deliberate indifference by failing to conduct a second CT scan, delaying his surgery, failing to provide post-op pain medication, and delaying his physical therapy. Plaintiff complains that BOP Defendants failed to comply with Dr. Charron's recommendation and conduct a second MRI. During Plaintiff's initial appointment with Dr. Charron, Dr. Charron indicated that he would most likely recommend surgery but he wanted an MRI to confirm. Dr. Charron indicated that Plaintiff advised he had a prior MRI, but Dr. Charron stated that he was unable the located the MRI. The record reveals that less than a week after Plaintiff's appointment with Dr. Charron, PA Carothers advised Dr. Charron of Plaintiff's recent CT scan and a copy of such was sent to Dr. Charron. Approximately three weeks later, Dr. Charron notified BOP staff of his recommendation of surgery to repair to non-healing of the scaphoid fracture. On the same day, PA Carothers submitted a request for authorization of the surgery and any related follow-ups. Within five weeks of the request for authorization, the authorization was granted and Plaintiff underwent surgery performed by Dr. Charron (January 10, 2018). Plaintiff complains that he did not received any pain medication upon his returned to

FCI McDowell on January 10, 2018, because it was after-hours for medical staff. Plaintiff's medical records, however, reveal that Plaintiff was examined and provided Tylenol 3 at 7:21 the following morning (January 11, 2018). Plaintiff was further prescribed Tylenol 3 twice a day for seven days at pill line. Plaintiff was provided with his Tylenol 3 until he complained two days later that the medication was making him nauseous. BOP Defendants, therefore, discontinued the Tylenol 3 and provided Plaintiff was Tylenol. The record confirms that BOP Defendants complied with Dr. Charron's recommendation concerning follow-up appointments, repeat x-rays, and prescribed medications. Concerning Dr. Charron's recommendation for physical therapy, the record reveals that such was recommend on March 6, 2018, PA Carothers wrote a consult result for physical therapy on March 22, 2018, and Plaintiff attended his initial physical therapy evaluation on April 25, 2018, where his potential for rehabilitation was noted as "good." Plaintiff was provided handouts and written instructions for an "at-home physical therapy regimen." Based upon the foregoing, there is no indication that BOP Defendants acted with deliberate indifference concerning Plaintiff's CT scan, surgery, or post-op care. At most, BOP Defendants may have been negligent in failing to provide medication for Plaintiff's pain on the day of his return to FCI McDowell following his surgery. As stated above, it is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." Webb, 281 Fed.Appx. at 166; also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Accordingly, the undersigned finds that Defendants did not act with deliberate indifference in providing medical treatment for Plaintiff's condition.

Based upon the undisputed facts, the undersigned finds that Defendant Meade and BOP Defendants did not act with deliberate indifference in providing medical treatment for Plaintiff's condition.

**C.    Respondeat superior is not applicable.**

In his Complaint, Plaintiff appears to contend that Defendants Connors, Dunbar, Rickard, Carver, and LeMaster violated his constitutional rights by failing to ensure that he received proper medical treatment. In their Motion, Defendants Connors, Dunbar, Rickard, Carver, and LeMaster contend their supervisory positions and the general notion that they are responsible for the actions of their subordinates are simply insufficient to form the basis of a claim for violations of a constitutional right, and they should be dismissed from this action. (Document No. 55, pp. 19 - 21.) First, Defendants Connors, Dunbar, Rickard, Carver, and LeMaster argue that they are not medical providers. (Id.) Next, Defendants Connors, Dunbar, Rickard, Carver, and LeMaster contend that Plaintiff fails to show that Defendants had direct involvement in any subordinate's unconstitutional actions. (Id.) Finally, Defendants Connors, Dunbar, Rickard, Carver, and LeMaster argue that they should be dismissed because Plaintiff names them as a defendant based upon their supervisory positions. (Id.)

In his Response, Plaintiff fails to specifically address the above argument. (Document No. 63.) Plaintiff, however, continues to argue that the above Defendants were notified of his alleged inadequate medical care via the administrative remedy process and each failed to ensure that Plaintiff received appropriate care. (Id., pp. 15 – 18.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 129 S.Ct. at

44

1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Also see Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendants individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendants Connors, Dunbar, Rickard, Carver, and LeMaster argue that Plaintiff has failed to demonstrate specifically how they were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendants Connors, Dunbar, Rickard, Carver, and LeMaster violated his constitutional rights with respect to their failure to supervise employees or in responding to his administrative remedies. The dismissal of a defendant is appropriate where the defendant's sole involvement in an action is related to the administrative remedy process. See Fellove v. Heady, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately

indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state *Bivens* claim"); Mabry v. Ramirez, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a *Bivens* claim for deliberate indifference to serious medical needs"); Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003), aff'd, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). Besides responding to administrative remedies, the evidence of record does not indicate any personal involvement by Defendants Connors, Dunbar, Rickard, Carver, and LeMaster. In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4th Cir. 1990). In the instant case, there is no evidence that Defendants Connors, Dunbar, Rickard, Carver, and LeMaster were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct.[13] Accordingly, Plaintiff has improperly raised his claim against Defendants Connors, Dunbar, Rickard, Carver, and LeMaster under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The Court, therefore, finds that BOP Defendants' "Motion to

---

[13] Additionally, as explained above, there is no indication that medical Defendants acted with deliberate indifference to Plaintiff's medical condition.

46

Dismiss, or in the Alternative Motion for Summary Judgment" should be granted. The undersigned finds it unnecessary to consider the other reasons which Defendant Meade and BOP Defendants have submitted for dismissal of Plaintiff's <u>Bivens</u> claim.

**4.      Plaintiff's Motion for Injunctive Relief:**

In his Motion for Injunctive Relief, Plaintiff requests an injunction preventing his placement in a higher security level. (Document No. 52.) Plaintiff states that he is designated as a medium security placement, but "Defendants have used their authority and power to go above and beyond to place me in a higher security placement." (<u>Id.</u>) Plaintiff states that "they switched my custody level for reasons not known to me other than retaliation." (<u>Id.</u>) Therefore, Plaintiff requests that this Court intervene and stop his transfer to a higher security placement. (<u>Id.</u>)

Rule 65(b) of the Federal Rules of Civil Procedure sets forth the limited circumstances under which a temporary restraining order can be granted as follows:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

The Fourth Circuit explained the different functions of temporary restraining orders and preliminary injunctions in <u>Hoechst Diafoil Company v. Nan Ya Plastics Corporation</u>, 174 F.3d 411, 422 (4th Cir. 1999), as follows:

> While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held: '[U]nder federal law [temporary restraining orders] should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.' <u>Granny Goose</u>, 415 U.S. at 439.

47

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

For the reasons fully explained above, the undersigned has recommended that Plaintiff's Complaint be dismissed as to all Defendants. Accordingly, the undersigned finds that Plaintiff's request for injunctive relief should be denied as he cannot establish that he is likely to succeed on the merits.

## PROPOSAL AND RECOMMENDATION

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Defendant Meade's Motion to Dismiss (Document No. 33), **DENY** Plaintiff's Motion for Injunctive Relief (Document No. 52), **GRANT** BOP Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 54), **DENY** Plaintiff's Motion for Default Judgment (Document No. 56), and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections

identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Faber and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: May 15, 2019.

Omar J. Aboulhosn
United States Magistrate Judge